**MUTUAL SERVICE CASUALTY IN-SURANCE CO., INC. as Subrogee of Land O' Lakes, Inc., Plaintiff,**

v.

**Paul J. ARMBRECHT, D.V.M., Defendant.**

**No. C99–3099 MWB.**

United States District Court,
N.D. Iowa,
Central Division.

May 29, 2001.

Webb L. Wassmer, Simmons, Perrine, Albright & Ellwood, P.L.C., Cedar Rapids, IA, for plaintiff.

Patrick J. McNulty, Grefe & Sidney, P.L.C., Des Moines, IA, for defendant.

MEMORANDUM OPINION AND OR-
DER REGARDING PARTIES'
CROSS–MOTIONS FOR SUM-
MARY JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ............................................. 1103
 A. *Procedural and Factual Background* ................................ 1103
 B. *MSI's Claim* ............................................. 1105
 C. *MSI's Motion For Summary Judgment* .............................. 1109

II. *LEGAL ANALYSIS* ......................................... 1109
 A. *Standards for Summary Judgment* ................................ 1109
 B. *MSI's Breach of Contract Claim* .................................. 1110
 1. *Terms and conditions of the oral contract* ......................... 1110
 2. *Dr. Armbrecht's alleged breach of the contract* ..................... 1111

III. *CONCLUSION* ............................................ 1117

## I. INTRODUCTION

In this action, plaintiff Mutual Service Casualty Insurance Co. ("MSI"), as subrogee of Land O' Lakes ("LOL"), Inc., seeks to recover $125,000.00 for the settlement of a related lawsuit that was litigated previously in state court, plus $42,325.69 in attorneys fees and expenses that it expended in that lawsuit, against defendant Paul J. Armbrecht, D.V.M. ("Dr.Armbrecht"). The theory upon which MSI has moved to recover these monies is based on a claim for breach of contract. MSI contends that it is entitled to judgment as a matter of law on its claim for breach of contract, and filed a Motion for Summary Judgment on February 26, 2001. Shortly thereafter, on February 28, 2001, Dr. Armbrecht filed a Motion for Summary Judgment, however, the claim upon which Dr. Armbrecht has moved for summary judgment is not based on the claim that MSI pled. Rather, Dr. Armbrecht contends that MSI's claim is really a claim for indemnification, and, therefore, urges this

court to analyze MSI's claim accordingly. Consequently, before considering the parties' summary judgment motions, the court must determine what claim MSI set forth in its Complaint, and whether that claim, in light of the circumstances here, is cognizable under Iowa law.

### A. Procedural and Factual Background

In late 1994 and early 1995, LOL owned pigs located at the Jerome Monahan ("Monahan") swine finishing facility in Greene County, Iowa. LOL contracted with Monahan to raise the pigs to market weight for eventual sale. Dr. Armbrecht, a veterinarian, was retained and compensated by LOL to advise LOL regarding veterinary services, including control of pseudorabies.[1] Dr. Armbrecht's services were retained by LOL under an oral contract. In early January of 1995, some of the pigs at the Monahan facility tested positive for the pseudorabies virus ("PRV"). On January 21, 1995, in re-

---

1. Pseudorabies is defined as "the contagious, infectious, and communicable disease of livestock and other animals known as Aujeszky's disease, mad itch, or infectious bulbar paralysis." IOWA CODE § 166D.2(35)

sponse to the pigs testing positive for PRV, Dr. Armbrecht prepared a herd investigation report and a herd cleanup plan[2] pursuant to Iowa Code § 166D.8, which was signed by Dr. Armbrecht, Jay Flora, the LOL supervisor with responsibility for the Monahan herd, and Dr. Michael Hartzell, the State of Iowa District Veterinarian. Following the completion of the herd cleanup plan, on February 6, 1995, Jay Flora advised Dr. Armbrecht that LOL wanted to move the pigs. Although exactly who "approved" the transportation of the pigs is in dispute, the parties agree that on February 13, 1995, approximately 450 head of swine, all of which had been diagnosed with PRV, were transported from the Monahan facility to a hog production facility in Calhoun County, Iowa, that was owned by the Ehn Brothers ("Ehn"). Significantly, the Ehn facility was located across a road from a "farrow to finish" hog production facility owned by Loren Hoag. The Hoag facility, which was housed a breeding herd, was located approximately 300 yards across the road from the Ehn facility. The LOL pigs remained at the Ehn facility until June of 1995, when they attained market weight and were sold to slaughter.

On August 15, 1995, approximately six of Loren Hoag's thirty sows in his swine herd were diagnosed PRV positive. On August 22, 1995, seven of Hoag's twenty-one pigs in the finishing herd were also diagnosed PRV positive. On July 31, 1996, Loren Hoag initiated an action against LOL wherein Hoag alleged that LOL negligently shipped hogs, infected with PRV, to a facility across the road from Hoag's hog facility, which resulted in the infection of Hoag's pigs with PRV. On November 10, 1997, a mediation took place between LOL and Loren Hoag in an attempt to settle the matter, however, the parties were unsuccessful in reaching an agreement. On November 19, 1997, LOL offered to settle the Hoag litigation for $65,000.00, and on November 20, 1997, Hoag counter-offered with $140,000.00. The parties could not reach a settlement and the case proceeded to trial. Trial began on December 9, 1997, and Dr. Armbrecht was the second witness called to testify at trial. On the second day of trial, LOL settled the case with Loren Hoag for $125,000.00, and on December 30, 1997, Loren Hoag released LOL, MBA Veterinary Clinic and Paul Armbrecht from any and all liability relating to the claims asserted in the underlying Hoag lawsuit.

MSI, as subrogee of LOL, initiated this action against Dr. Armbrecht on December 23, 1999. In its Complaint, MSI alleges that the contract between LOL and Dr. Armbrecht obligated Dr. Armbrecht to perform his duties as a veterinarian for LOL with the degree of skill, care and learning ordinarily possessed and exercised by other veterinarians in similar circumstances. MSI alleges that Dr. Armbrecht breached his contractual duty based on the following: (1) failure to obtain authorization to move the pigs from the State of Iowa District Veterinarian; (2) failure to prepare and comply with a proper Heard Cleanup Plan as required by Iowa law; (3) failure to obtain a Certificate of Inspection permitting the movement of pigs as required by Iowa law; and (4) moving the pseudorabies infected pigs to premises which did not qualify as approved premises under Iowa law. MSI contends

**2.** Herd cleanup plan is defined as "a plan to eliminate pseudorabies from a swine herd. The plan must be developed by an epidemiologist in consultation with the herd owner and the owner's veterinary practitioner. The plan must be approved and signed by the epidemiologist, the owner, and the practitioner. The plan must be approved and filed with the department." Iowa Code § 166D.2(21)

that Dr. Armbrecht's breach of contract proximately caused damage to LOL and to MSI, as subrogee of LOL. In his Answer, Dr. Armbrecht generally denies these allegations and asserts several affirmative defenses.

A hearing on the parties' cross-motions for summary judgment was held on May 16, 2001. Plaintiff MSI was represented by Webb. L. Wassmer of Simmons, Perrine, Albright & Ellwood, P.L.C., Cedar Rapids, Iowa. Defendant Paul J. Armbrecht, D.V.M., was represented by Patrick J. McNulty of Grefe & Sidney, P.L.C., Des Moines, Iowa.

### B. MSI's Claim

As indicated previously, MSI and Dr. Armbrecht have moved for summary judgment on different claims, and both parties contend that the other party has misconstrued the nature of the claim pled by MSI. The court, therefore, must initially determine what claim MSI pled in its Complaint, and the effect that such a claim has on the respective motions for summary judgment filed by the parties.

Dr. Armbrecht asserts that in this action MSI seeks to recoup the $125,000.00 that it paid to Loren Hoag in the settlement reached between LOL and Hoag. Dr. Armbrecht argues that irrespective of the theory that MSI invokes to recoup its losses here, its damages are indisputably indemnity in nature, and, therefore, the court must analyze MSI's claim based on a theory of indemnification. MSI disagrees and argues that the standard applicable to recovery based on a theory of indemnification is entirely different than the standard applicable to recovery based on a theory of breach of contract under Iowa law. MSI contends that it clearly pled a subrogated claim for breach of contract as its theory of recovery here, and, thus, its claim should be analyzed accordingly.

■ First, the court notes that there is no dispute between the parties that MSI is LOL's subrogee. Therefore, the question becomes what causes of action can LOL properly assert against Dr. Armbrecht? The court finds that LOL can assert a breach of contract claim against Dr. Armbrecht, and, therefore, as LOL's subrogee, MSI can also assert a breach of contract claim against Dr. Armbrecht. Although Dr. Armbrecht argues otherwise, he has failed to establish that the only legally cognizable theory of recovery that MSI can assert against him is a theory based on indemnification. In fact, as MSI points out, in *Ke–Wash Co. v. Stauffer Chemical Co.*, 177 N.W.2d 5 (Iowa 1970), the Iowa Supreme Court recognized the two theories of recovery based on a claim for breach of contract and a claim for indemnification and ultimately concluded that the theories were, indeed, separate and distinct. The court finds that an examination of the Iowa Supreme Court's decision in *Ke–Wash* would be beneficial here.

*Ke–Wash* involved an action brought by a distributor of a chemical known as "Knoxweed 42" against the chemical manufacturer to indemnify it for expenditures made in settling an earlier action in which both parties were named defendants. The distributor of "Knoxweed 42" was the Ke–Wash Company ("Ke–Wash") and the manufacturer of "Knoxweed 42" was Stauffer Chemical Company ("Stauffer"). "Knoxweed 42" was a pre-emergence weed killer. In the Spring of 1965, Ke–Wash sold "Knoxweed 42" to a farmer. Use of that chemical resulted in crop damage to the farmer, and the farmer complained to Ke–Wash. Ke–Wash referred the farmer's complaint to Stauffer, which in turn advised Ke–Wash by letter that the complaint was Stauffer's responsibility. However, the matter proceeded to trial, and the farmer sought to recover the sum of

his damages from Stauffer and Ke–Wash. On the third day of trial, the parties entered into a settlement with both Stauffer and Ke–Wash contributing to the settlement.

Thereafter, Ke-wash initiated an action for reimbursement from Stauffer for the amount it contributed to the settlement and for legal fees, court reporting services and mileage expenses. To recover this money, Ke–Wash set forth the two following theories of recovery: (1) indemnity; and (2) breach of contract. With respect to the first claim, the Iowa Supreme Court stated that except where there is an express agreement for indemnification, a party seeking to establish in an independent action a right to indemnity must plead and prove the following: (1) it was liable to the injured party; (2) the settlement was reasonable; and (3) the facts were such as to give rise to a duty on the party of the indemnitor to indemnify the indemnitee. *Ke–Wash,* 177 N.W.2d at 11. The Iowa Supreme Court determined that the trial court erred in failing to sustain Stauffer's motion to dismiss that part of Ke–Wash's petition, because Ke–Wash failed to establish the first of the preceding elements. *Id.* at 12. With respect to the second theory—breach of contract—the Iowa Supreme Court stated that the trial court was correct in construing the letters between Stauffer and Ke–Wash as a contract to perform rather than a contract to indemnify, and that Stauffer's default in performance of the contractual obligations imposed on it by the contract entitled Ke–Wash to damages without a showing of Stauffer's legal liability in the prior action with the farmer. *Id.* Specifically, the Iowa Supreme Court said that there was substantial evidence to support a finding by the trial court that there was an enforceable contract between the parties based on adequate consideration in which Stauffer assumed the obligation to handle any grower complaints directly with the grower and directed Ke–Wash not to become involved. *Id.* at 13. The court emphasized that Stauffer failed to perform the contractual obligation in connection with the complaint in the underlying lawsuit, and when it failed to perform, Ke–Wash was damaged to the extent of the amount paid toward settlement, attorney's fees, court costs, and mileage expenses incurred. *Id.*

Thus, the Iowa Supreme Court held that plaintiff Ke–Wash could set forth a theory of recovery based on a breach of contract claim and an indemnification claim to recover its damages, because the two theories were separate and distinct. *Id.* Dr. Armbrecht's argument in support of construing the claim as one for indemnification that, the theory under which MSI seeks to recoup the $125,000.00 from the settlement with Loren Hoag is "immaterial," is therefore inconsistent with *Ke–Wash.* The Iowa Supreme Court emphasized the difference between the two theories of recovery proposed by both parties here.

Not only does this court find support for its conclusion from the Iowa Supreme Court, but the Third Circuit Court of Appeals in *Kane v. BOC Group, Inc.,* 234 F.3d 160 (3d Cir.2000) had occasion to address the same argument raised by Dr. Armbrecht here—that is, whether plaintiff's claim, although pled as a claim for breach of contract, should be construed as a claim for indemnification. In that case, BOC leased a cryogenic screw auger to Quality Foods under an agreement that Quality Foods would provide a safe workplace and protect its employees against injury. Helen Kane, a Quality Foods employee, was cleaning condensation from the ceiling in the area of the screw auger when her right arm became entangled in it. Her arm was trapped for nearly two hours and was amputated as a result of the

injury. The Third Circuit Court of Appeals concluded that, under New Jersey law, any inability on the part of BOC to recover from Quality Foods on theories of express or implied indemnity for the costs of settling Helen Kane's claims against BOC did not preclude it from recovering from Quality Foods on a theory that Quality Foods breached the contract to maintain a safe workplace, because the two theories of breach of contract and indemnification were separate and distinct. Specifically, in reaching its decision, the Third Circuit Court of Appeals explained the following:

> Both the [*Port Authority of N.Y. & N.J. v.*] *Honeywell* [*Protective Servc.*, 222 N.J.Super. 11, 535 A.2d 974 (App.Div. 1987)] and *Mayer* [*v. Fairlawn Jewish Center*, 38 N.J. 549, 186 A.2d 274 (1962)] decisions emphasized that the breach of contract theory is a cause of action separate from the theories of express or implied indemnification. Thus in *Honeywell,* the court wrote about the breach of contract theory: "Even without regard to the theory of implied indemnification, there is a potential contractual basis for a jury to find liability on the part of Honeywell. . . ." 535 A.2d at 980. And the court in *Mayer* observed about the Center's breach of contract claim: "We are not dealing here with a claim of express or implied indemnity or restitution." 186 A.2d at 281. Even [*Frank*] *Martz* [*Coach Co., Inc. v. Hudson Bus Transp. Co. Inc.*, 23 N.J. Misc. 342, 44 A.2d 488, 491 (1945)] from which the District Court cites the standard for indemnification, recognized that recovery based on breach of contract is different from recovery based on indemnification. In *Martz,* the plaintiff's complaint for recovery of settlement money consisted of two counts—the first was based on breach of contract and the second was based on indemnity. Instead of treating the two counts identically, as the District Court would have us do, the court found against the plaintiff on the breach of contract count because he had failed to prove a breach, not because he had not met the indemnification standard that the court applied to the second count. *Id.* at 489.

The fact that BOC can recover on the breach of contract theory what it is unable to recover on the theories of express and implied indemnity does not change the analysis. In *Polidori v. Kordys, Puzio & Di Tomasso, AIA,* 217 N.J.Super. 424, 526 A.2d 230 ([Ct.App. Div.] 1987), the court faced the same objection. Its response is apt here:

> [T]he damages here are claimed to flow as a consequence of a breach of the contractual relationship between Polidori, Kordys, and Superior. This is an entirely separate and distinct cause of action from the contribution and indemnification counts of the complaint. What Kordys and Superior are arguing, in effect, is that because Polidori is precluded from recovery on one theory, he must be barred from recovery on all others. This is obviously incorrect. It is simply of no consequence that an award on the contract count of the complaint would have the effect of giving Polidori the recovery he could not obtain on the contribution and indemnification counts. This is a common result where a complaint alleges more than one theory of recovery. *Id.* at 235.

*Kane,* 234 F.3d at 166. Thus, based on these two decisions, primarily *Ke–Wash,* this court concludes that MSI is able to set forth a claim for breach of contract as a theory of recovery here. Indeed, the Iowa Supreme Court made it abundantly clear that MSI could set forth a theory of recov-

ery based on breach of contract. Because this is precisely what MSI did in this case—that is, plead a breach of contract claim—the court will treat its claim as it was pled.

Additionally, the court points out that MSI could not have theoretically set forth a theory of recovery based on implied indemnification, because LOL never admitted liability to Hoag. In its Answer, and throughout the underlying state litigation, LOL denied liability to Hoag, and has since denied any and all liability. As the Iowa Supreme Court in *Ke–Wash* explained: "Indemnity indicates the entire liability for loss is shifted from one person held legally responsible to another person." *Ke–Wash*, 177 N.W.2d at 10. Here, MSI is not attempting to shift responsibility from LOL to Dr. Armbrecht, because LOL was never held legally responsible to Hoag. The *Ke–Wash* court explained that "a party seeking to establish in an independent action a right of indemnity as a theory of recovery must plead and prove three basic elements: (1) it was liable to the injured party...." *Id.* at 11. Because LOL never admitted that is was liable to Hoag, and because MSI has neither pled, nor proved that LOL was liable to Hoag, MSI cannot establish in an independent action as right of indemnity as a theory of recovery. However, as the holding in *Ke–Wash* makes clear, where there is a contract to perform between LOL and Dr. Armbrecht, MSI, as LOL's subrogee, may set forth a theory of recovery based on breach of contract.

The court distills from Dr. Armbrecht's argument that his primary concern with allowing MSI to bring forth this action based on a breach of contract theo-

ry, instead of an implied indemnification theory, relates to the protections that he contends enure to implied indemnification claims and not to breach of contract claims. Specifically, Dr. Armbrecht argues that if two out of the three elements of an implied indemnification claim were not required, namely that the settlement of the underlying claim was reasonable and that the indemnitee was itself liable to the injured party, "a party like MSI could, for example, settle the underlying case for $1,000,000 where arguable no legal liability existed and a party like Dr. Armbrecht would be prevented from contesting the same because somehow the damages sought are just garden variety 'reasonably foreseeable' damages caused by the typical breach of contract." *See* Defendant's Brief in Support of Reply to Resistance to Motion for Summary Judgment at 3. However, in this case, the damages that Dr. Armbrecht caused by his alleged breach are not "the garden variety reasonably foreseeable damages," but instead are damages that were proximately caused by Dr. Armbrecht's alleged breach. This is so, because MSI contends that it was Dr. Armbrecht's failure to use due care[3] which caused him to breach his implied contractual duty to LOL. Accordingly, Dr. Armbrecht will not be susceptible for damages that are reasonably foreseeable; rather, he will only be liable, if at all, for those damages that were proximately caused by his alleged breach. MSI will have to prove that the conduct of Dr. Armbrecht was a substantial factor in producing the damages suffered by LOL and that these damages would not have happened except for Dr. Armbrecht's conduct. MSI even recognizes that it will have to prove that Dr.

---

**3.** "While ordinarily a breach of contract is not a tort, the contract, nevertheless, may establish some duty for which a violation may be tortious, or the neglect of which an action *ex delicto* will lie." *M & W Farm Service Co. v. Callison*, 285 N.W.2d 271, 276 (Iowa 1979) (internal citations omitted).

Armbrecht's conduct was a proximate cause of the damages that LOL suffered. *See* Brief in Support of Plaintiff's Motion for Summary Judgment at 14. Thus, by virtue of the fact that MSI must prove that Dr. Armbrecht proximately caused its damages, Dr. Armbrecht is protected against being held liable for damages from an unreasonable settlement, or portions thereof, which was based on factors other than his alleged breach. Consequently, because MSI clearly pled a claim for breach of contract as its theory of recovery here, the court concludes that Dr. Armbrecht's Motion for Summary Judgment on an issue not pled by MSI is not properly before this court. Dr. Armbrecht's Motion for Summary Judgment is therefore denied. The court now turns to MSI's Motion for Summary Judgment.

### C. MSI's Motion For Summary Judgment

■ MSI contends that it is entitled to summary judgment on its subrogated claim for breach of contract against Dr. Armbrecht. MSI asserts that the primary dispute between the parties concerns the terms of the contract, specifically whether the contract between LOL and Dr. Armbrecht contained an implied term obligating Dr. Armbrecht to use the degree of skill, care and learning ordinarily possessed and exercised and used by other veterinarians in similar circumstances with respect to the movement of the pigs from the Monahan facility to the Ehn facility, and whether Dr. Armbrecht breached this duty, if such a duty did, in fact, exist. MSI asserts that LOL expressly consulted Dr. Armbrecht regarding the movement of the pigs and moved the pigs in reliance on Dr. Armbrecht's expertise of the applicable laws and regulations. Because Dr. Armbrecht allegedly failed to properly advise LOL that the Ehn facility did not qualify as an "approved premises" within

the meaning of Iowa law as a destination for PRV infected hogs, Dr. Armbrecht breached his implied contractual duty.

In response, Dr. Armbrecht contends that he did not breach his contractual duty under the terms of the contract, because MSI cannot establish that there was a term in the contract between LOL and Dr. Armbrecht that required Dr. Armbrecht to fulfill all state regulations. Additionally, Dr. Armbrecht asserts that his actions with respect to the movement of the pigs from the Monahan facility to the Ehn facility were in accord with common veterinary practices—that is, between 1994–1995, it was common veterinary practice to regularly move PRV positive pigs from one location to another upon notification to and authorization by a government veterinarian without the necessity of an approved premises permit if ownership of these pigs did not change. Thus, Dr. Armbrecht contends that he did not breach the terms of the contract, because his involvement with the transportation of the pigs from the Monahan facility to the Ehn facility was in compliance with the common veterinary practices of the time. Additionally, Dr. Armbrecht contends that he did not breach the contract, because the record is undisputed that the state did not attempt to enforce any alleged violations of the regulations regarding the movement of the PRV positive pigs.

### II. LEGAL ANALYSIS

#### A. Standards for Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997);

*Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* ── U.S. ──, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of MSI's motion for summary judgment on its breach of contract claim.

**B. MSI's Breach of Contract Claim**

■ From the outset, the court notes that the facts alleged against Dr. Arm-

brecht as a veterinarian seem to fit squarely within a claim for professional malpractice. However, MSI points out that an allegedly negligent veterinarian may also be sued on the basis of a breach of contract theory. *See* 78 AM.JUR.2D, *Veterinarians*, § 13 (1975) ("While the liability of a veterinarian may be based upon breach of contract or warranty, or gross ignorance and want of skill, most cases discuss the liability of a veterinarian from the standpoint of negligence as predicated upon the violation of a duty of care."). Thus, because MSI has elected to set forth its claim against Dr. Armbrecht based upon a breach of contract theory, the court will analyze its claim accordingly.

 In a breach-of-contract claim under Iowa law, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach. *Molo Oil Co. v. River City Ford Truck Sales, Inc.* 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)). A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract. *Id.* (citing *Magnusson Agency v. Public Entity Nat'l Co. Midwest*, 560 N.W.2d 20, 27 (Iowa 1997)). In this case, the parties acknowledge that an oral contract existed between LOL and Dr. Armbrecht, and further that Dr. Armbrecht received compensation for the veterinarian services he rendered to LOL. The fighting issues between the parties concern what the terms and conditions of the oral contract were between Dr. Armbrecht and LOL, and whether Dr. Armbrecht breached any of these terms and conditions in some particular way.

### 1. Terms and conditions of the oral contract

 The Iowa Supreme Court has stated that "[w]hile ordinarily a breach of contract is not a tort, the contract, nevertheless, may establish some duty for which a violation may be tortious, or the neglect of which an action *ex delicto* will lie." *M & W Farm Service Co. v. Callison*, 285 N.W.2d 271, 276 (Iowa 1979) (internal citations omitted); *Mid–Country Meats, Inc. v. Woodruff Evans Constr.*, 334 N.W.2d 332, 336 (Iowa App.Ct.1983) (breach of contractual duty is tort founded on contract).[4] In other words, a contract may give rise to a duty, the breach of which may be tortious. The Iowa Supreme Court has stated that "[w]hether the contract establishes such a duty of care is a question of law for the courts to decide." *M & W Farm Service Co.*, 285 N.W.2d at 276. Therefore, while the terms of an oral contract are ordinarily questions for the trier of fact, *see Audus v. Sabre Communications Corp.*, 554 N.W.2d 868, 871 (Iowa 1996); *Dallenbach v. Mapco Gas Prod., Inc.*, 459 N.W.2d 483, 486 (Iowa 1990); *Matter of Estate of Warfield v.*

---

· 4. *See also Giarratano v. Weitz Co.*, 259 Iowa 1292, 147 N.W.2d 824, 832 (Iowa 1967), for the following:

It appears to be well settled in Iowa that where a contract imposes a duty upon a person, the neglect of that duty is a tort, and an action ex delicto will lie. "A tort may be dependent upon, or independent of, contract. If a contract imposes a legal duty upon a person the neglect of that duty is a tort founded on contract, so that an action *ex contractu* for the breach of the contract, or an action *ex delicto* for the breach of the duty, may be brought at the option of the plaintiff." *Matthys v. Donelson*, 179 Iowa 1111, 160 N.W. 944, 946 (1917); *Kunzman v. Cherokee Silo Co.*, 253 Iowa 885, 114 N.W.2d 534, 537 (1962).

*Norwest Bank of Iowa, N.A.*, 2001 WL 246386, at *2 (Iowa Ct.App. March 14, 2001); *Gallagher, Langlas & Gallagher v. Burco*, 587 N.W.2d 615, 617 (Iowa Ct.App. 1998), here, the court must determine, as a matter of law, whether the oral contract at issue established a duty, which Dr. Armbrecht in turn allegedly violated.

MSI contends the oral contract between LOL and Dr. Armbrecht contained an implied term or a duty obligating Dr. Armbrecht to use the degree of skill, care and learning ordinarily possessed and exercised and used by other veterinarians in similar circumstances with respect to the movement of the pigs that tested positive for PRV from the Monahan facility to the Ehn facility. MSI recognizes that the Iowa Supreme Court has not yet addressed whether such a duty exists with respect to veterinarians, however, MSI argues by way of analogy that such a duty does, in fact, exist under Iowa law. In his resistance to MSI's motion for summary judgment, Dr. Armbrecht does not dispute MSI's contention that he was obligated to use the degree of skill, care and learning ordinarily possessed and exercised and used by other veterinarians in similar circumstances with respect to the movement of the PRV positive pigs from the Monahan facility to the Ehn facility. Rather, he contends that "[t]he implied contractual standard by which to judge the performance of the terms is irrelevant in this case." *See* Defendant's Amended Resistance to Plaintiff's Motion for Summary Judgment at 2.

The court agrees with MSI that when Dr. Armbrecht agreed to perform veterinary services for LOL, he impliedly agreed to exercise proper skill and perform the contract obligations in an appropriate manner. Indeed, MSI directs the court's attention to *Meyer v. Nottger*, 241 N.W.2d 911 (Iowa 1976), in which the Iowa Supreme Court stated in pertinent part:

> Where one holds himself out as specially qualified to perform the services incident to a funeral and burial, unless there is express contrary agreement, *it is implied in a contract for such services that such person will exercise proper skill and perform the contract obligations in a workmanlike manner.*

*Id.* at 920–21 (citations omitted). Although *Nottger* is factually dissimilar to this case, the legal justification for finding that the contract contained an implied duty is based on a person holding himself/herself out as specially qualified to perform services. In this case, Dr. Armbrecht was a licensed and practicing veterinarian in the State of Iowa. He was appointed to the Pseudorabies Advisory Board in 1994. Clearly he held himself out as specially qualified to perform veterinary services, and LOL sought his services because he was specially qualified to perform such services.

The Iowa Supreme Court has found that an implied duty of care exists in construction contracts, *see Busker v. Sokolowski*, 203 N.W.2d 301, 303 (Iowa 1972) (stating that in construction contracts it is implied, unless there is express contrary agreement, that the building will be erected in a reasonably good and workmanlike manner and will be reasonably fit for the intended purpose) (quotation and citation omitted), contracts with architects, *see Roland A. Wilson & Associates v. Forty–O–Four Grand Corp.*, 246 N.W.2d 922, 925 (Iowa 1976) (holding that an architect owes a duty to his or her client to exercise reasonable care to see that the work is done in a proper manner with proper materials, and that this duty is breached when, *inter alia,* the architect negligently certifies completion of defective or incomplete work) (quotation and

citations omitted), and contracts with physicians. Indeed, by analogizing the contractual relationship between a veterinarian and his/her client with the contractual relationship between a physician and his/her patient, the court finds further support that such an implied duty exists between Dr. Armbrecht, a veterinarian, and LOL, his client. The Iowa Supreme Court has stated the following with respect to the contractual relationship between a physician and his/her patient:

> A physician owes a duty to his patient to exercise the ordinary knowledge and skill of his or her profession in a reasonable and careful manner when undertaking the care and treatment of a patient. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind.1991). *This duty arises from the contractual relationship entered into between the two. Id.* Thus, the duty is based upon privity.

*J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 259 (Iowa 1999) (emphasis added). Furthermore, in an action against a veterinarian for the alleged negligent vaccination of hogs, the Iowa Supreme Court stated the following:

> As a veterinarian defendant was duty bound to bring to his service the learning, skill and care which characterizes the profession generally. In other words, the care and diligence required was that as a careful and trustworthy veterinarian would be expected to exercise.

*Ruden v. Hansen*, 206 N.W.2d 713, 715 (Iowa 1973) (citations omitted); *see also Price v. Brown*, 545 Pa. 216, 680 A.2d 1149, 1152 (1996) ("As to a cause of action based on the negligence of a veterinarian in the performance of his/her professional duties or services, we note at the outset that malpractice claims have traditionally arisen in the context of services provided by the legal and medical professions. Sim-

ilar to the practice of law or medicine, the vocation of veterinary medicine involves specialized education, knowledge, and skills. We conclude, therefore, that professional negligence concepts also extend to veterinary medicine."); *Downing v. Gully*, 915 S.W.2d 181, 184 (Tex.Ct.App. 1996) (treating negligence claim against veterinarian as a claim for medical malpractice and applying the duty of care ascribed to physicians). Although the Iowa Supreme Court's decision in *Ruden* did not involve a breach of contract claim against a veterinarian, the court nonetheless indicated that veterinarians were "duty bound" to use the degree of skill, care and learning ordinarily possessed and exercised and used by other veterinarians in similar circumstances. Thus, based on the contractual relationship between Dr. Armbrecht and LOL, the court finds that when Dr. Armbrecht rendered his services to LOL that an implied duty to use the degree of skill, care and learning ordinarily possessed and exercised and used by other veterinarians in similar circumstances arose. *See Barney v. Pinkham*, 29 Neb. 350, 45 N.W. 694 (1890) ("A veterinary surgeon impliedly engages and is bound to use, in the performance of his duties in his employment, such reasonable skill, diligence, and attention as may be ordinarily expected of persons in that profession. He does not contract to use the highest degree of skill, nor an extraordinary amount of diligence, but to exercise a reasonable degree of knowledge, diligence and attention.... The implied contract of the plaintiff in error was not to cure [the plaintiff's mare], but to possess, and apply in his treatment of the case, such reasonable skill and diligence as are ordinarily exercised in his profession"). Having established that an implied duty exists in this case and having set forth what that standard is, the court must determine whether MSI has proved that Dr. Arm-

brecht breached this duty as a matter of law.

### 2. Dr. Armbrecht's alleged breach of the contract

The Iowa Supreme Court has repeatedly stated that whether an oral contract was breached is ordinarily a question for the trier of fact. *See Audus v. Sabre Communications Corp.,* 554 N.W.2d 868, 871 (Iowa 1996); *Dallenbach v. Mapco Gas Prod., Inc.,* 459 N.W.2d 483, 486 (Iowa 1990); *Warfield v. Norwest Bank of Iowa, N.A.,* 2001 WL 246386, *2 (Iowa Ct.App. March 14, 2001); *Gallagher, Langlas & Gallagher v. Burco,* 587 N.W.2d 615, 617 (Iowa Ct.App.1998). Nevertheless, MSI contends here that there is no genuine issue of material fact as to whether Dr. Armbrecht breached his duty, and, thus summary judgment in its favor is warranted here.

MSI claims that Dr. Armbrecht breached his implied contractual duty to LOL when Dr. Armbrecht advised LOL that they could move the PRV pigs from the Monahan facility to the Ehn facility despite the fact that the Ehn facility was not, and could not, have been an "approved premises" for the acceptance of PRV pigs within the meaning of Iowa law and the herd cleanup plan. MSI asserts that LOL relied on Dr. Armbrecht's expertise to provide LOL with advice regarding the movement of the pigs, and that part of that reliance was an expectation on the part of LOL that Dr. Armbrecht, as a veterinarian and a member of the Iowa Pseudorabies Advisory Committee, would properly advise LOL on what was permitted and what was not permitted by the applicable laws and regulations.

Specifically, MSI contends that, in February of 1995, when Dr. Armbrecht was advising LOL, Iowa law required PRV positive pigs to be moved only to slaughter or to an approved premises. MSI cites to IOWA CODE § 166D.10(3)(c) which provides in pertinent part:

> 3. A feeder pig moved intrastate shall be moved according to the following:
>
> . . . .
>
> c. A feeder pig in a known infected herd shall be subject to restricted movement by certificate of inspection and only to an *approved premises.*

*Id.* (emphasis added). The Iowa Code defines "approved premises" as "a dry lot facility located in an area with confirmed cases of pseudorabies infection, which is authorized by the department to receive, hold, or feed infected swine, exposed animals, or swine of unknown status. The premises and all swine on the premises shall be considered under quarantine. However, swine may be moved to slaughter under a transportation certificate or may be moved to another pseudorabies approved premises under a certificate of inspection." IOWA CODE § 166D.2(2). The Iowa Administrative Code sets forth requirements establishing, renewing, or revoking an approved premises permit:

> b. To be valid, an approved premises must be detailed as part of a herd cleanup plan and approved by a department or inspection service official certifying that the facility meets the following guidelines:
>
> . . . .
>
> (2) Shall not be in the vicinity of a breeding herd.

IOWA ADMIN. CODE 21–64.160(1)(b)(2)(2001). MSI contends that based on Dr. Armbrecht's own admissions it cannot be disputed that he breached his duty to LOL regarding the movement of the LOL pigs from the Monahan facility to the Ehn facility. This is so, because MSI claims that Dr. Armbrecht neither advised LOL that it could not move the pigs to the Ehn facility as that facility did not have an

approved premises permit, nor did Dr. Armbrecht advise LOL that an approved premises permit could not be obtained because the Hoag facility, a breeding herd facility, was in the "vicinity" of the Ehn facility. To further buttress its argument, MSI has submitted the affidavit of a licensed veterinarian, Thomas L. Pollock, D.V.M., in which he states:

[A]s to the issue of Dr. Armbrecht's responsibility to Land'O Lakes, I can only relate my interpretations of the responsibilities of an accredited veterinarian to a client. Livestock producers rely heavily on their servicing veterinarian to provide them with information concerning state and federal regulations. Accredited veterinarians are regularly updated on these regulations and are expected to help keep their clients in compliance. By not acting when he knew an illegal movement of PRV infected pigs was imminent, Dr. Armbrecht neglected his duty to his client, Land'O Lakes, and to the state as an accredited veterinarian. Dr. Armbrecht stated in his testimony that he did not believe that it was his responsibility to know if the Ehn facility had been designated as a State Approved Premise. I absolutely disagree with that assertion. If accredited veterinarians take the attitude that they can ignore violations of regulations without any consequence, then PRV will not be eradicated and will continue to cost producers and the state of Iowa enormously.

*See* Plaintiff's Exhibit 10.

In response, Dr. Armbrecht contends that he did not breach the terms of his contract, arguing that it was customary "real world" veterinary practices in 1995 for veterinarians dealing with PRV infected herds to move the PRV positive pigs from one facility to another facility of common use, as long as ownership of the pigs did not change, with the approval of the governmental district veterinarian, Dr. Michael Hartzell. Dr. Armbrecht contends that when he was consulted by LOL regarding the movement of the PRV pigs from the Monahan facility to the Ehn facility under the same ownership, he obtained verbal approval for the move from Dr. Michael Hartzell, based on the customary "real world" veterinary practices. In his affidavit, Dr. Armbrecht states as follows:

5. Where a sale of pseudorabies positive pigs was not involved, i.e., the producer desired to move them to another site operated by the same producer, the department in 1994 and 1995 merely required notification. In those cases involving movement but not sale in which I was involved prior to February of 1995 (dozens of times), the department never objected to the move and never required an approved premises permit or similar document.

6. Prior to January of 1995, LOL, to my personal observation and knowledge, was aware that the department did not require an approved premise or similar document for the movement of pseudorabies pigs where ownership was not transferred.

7. Dr. Michael Hartzell's approval in February of 1995 of the movement of the pigs from the Monahan facility to the Ehn Bros. facility (see Exhibit A, trial testimony of Paul Armbrecht under examination of LOL attorney, Phil Dorff; Exhibit B, deposition testimony of Paul Armbrecht in this case pp. 94–99; and Exhibit C, relevant E-mails) is illustrative of how the department treated, from a regulatory standpoint, the movement of pseudorabies pigs in the 1994–96 time frame where ownership was not transferred.

*See* Defendant's Exhibit 34. Additionally, Dr. Armbrecht points out that the State of Iowa did not attempt to enforce any perceived violations of the regulations that MSI contends he violated regarding the

movement of the pigs from the Monahan facility to the Ehn facility, and that state veterinary officials gave their approval to move the LOL pigs from the Monahan facility to the Ehn facility. The inaction of the State of Iowa, Dr. Armbrecht argues, reinforces his claim that he exercised the customary "real world" veterinary practices regarding the movement of the pigs when there was no change in the ownership of the pigs.

The court finds that Dr. Armbrecht has generated a genuine issue of material fact as to whether he breached his duty to LOL. Although the court has concluded that when Dr. Armbrecht advised LOL regarding the transportation of the pigs from the Monahan facility to the Ehn facility he was bound to use the degree of skill, care and learning ordinarily possessed and exercised and used by other veterinarians in similar circumstances, the court cannot find, as a matter of law, that Dr. Armbrecht breached this duty in light of his argument that he complied with the alleged customary "real world" veterinary practices. The court finds that whether the customary "real world" veterinary practices fall below the applicable standard of care is a question for the trier of fact.

MSI, however, argues that Dr. Armbrecht cannot excuse his breach of his contractual duty to use due care by claiming that is was the customary "real world" practice to move PRV positive pigs in violation of the applicable laws and regulations, and in support thereof cites the following cases: *See Ales v. Ryan*, 8 Cal.2d 82, 64 P.2d 409, 418 (1936) (en banc) (stating that "negligence cannot be excused on the ground that others in the same locality practice the same kind of negligence"); *Nowatske v. Osterloh*, 198 Wis.2d 419, 543 N.W.2d 265, 271 (1996); *Vassos v. Roussalis*, 658 P.2d 1284, 1288 (Wyo.1983); *Morrison v. MacNamara*, 407 A.2d 555, 565 (D.C.Ct.App.1979); *Pederson v. Dumouchel*, 72 Wash.2d 73, 431 P.2d 973, 977

(1967) (en banc); *Sarti v. Udall*, 91 Ariz. 24, 369 P.2d 92, 94 (1962) (en banc). MSI raises the issue of the "locality rule," which essentially places a qualification upon the standard of care and skill required of a physician based on practices espoused in like localities. *See Speed v. State of Iowa*, 240 N.W.2d 901, 907 (Iowa 1976). The Supreme Court of Iowa has disapproved of the "locality rule" insofar as negligence of hospitals and veterinarians are concerned, *see Dickinson v. Mailliard*, 175 N.W.2d 588, 596–597 (Iowa 1970) and *Ruden*, 206 N.W.2d at 715–16, however, despite its disapproval, it has not foreclosed considering evidence of customary practices or local practices, explaining "[t]he standard of care practiced in the particular community or like communities may be one of the elements to be considered but it is not conclusive." *Ruden*, 206 N.W.2d at 716. In *Speed*, the Iowa Supreme Court clarified its perception of the role that the locality rule assumed in considering a physician's duty, and indicated that the language from its decision in *McGulpin v. Bessmer*, 241 Iowa 1119, 43 N.W.2d 121, 128 (Iowa 1950) was directly on point. In *McGulpin*, the Iowa Supreme Court stated:

> There seems to be sound basis for holding a physician to such reasonable care and skill as is exercised by the ordinary physician of good standing under like circumstances. And the locality in question is merely one circumstance, not an absolute limit upon the skill required.

*Id.* In this case, therefore, while Dr. Armbrecht's argument that, he did not breach his contractual duty of care because he adhered to the customary "real world" veterinary practice when moving the PRV positive pigs, is "not an absolute limit upon the skill required," it nonetheless generates a genuine issue of material fact as to whether he breached his implied contractual duty to use the standard of care used by veterinarians under similar circum-

stances. It is for the trier of fact, and not this court, to determine whether Dr. Armbrecht's adherence to the customary "real world" practice falls below the standard of care implied in his contract despite its customary nature. *See Nowatske*, 543 N.W.2d at 271 ("If what passes for customary or usual care lags behind developments in medical science, such care *might* be negligent, despite its customary nature.") (emphasis added). The court does not disagree with MSI that Dr. Armbrecht's alleged failure to use due care cannot be excused on the ground that "all veterinarians violated the law," however, whether Dr. Armbrecht did violate the standard of care, thereby causing him to breach his implied contractual duty, is a question for the trier of fact.

Additionally, the court notes that the parties also dispute what type of "approval" Dr. Hartzell gave with respect to the movement of the pigs from the Monahan facility to the Ehn facility. MSI contends that Dr. Armbrecht failed to inform Dr. Hartzell that the Ehn facility was within the vicinity of the Hoag facility, and that had Dr. Hartzell been made privy to this information, he would not have approved the movement of the LOL pigs from the Monahan facility to the Ehn facility. Although Dr. Armbrecht does not refute MSI's claim that he did not disclose the information that the Ehn facility was within the vicinity of the Hoag facility, neither Dr. Armbrecht nor MSI know whether Dr. Hartzell already knew the locations of the facilities, yet went ahead and approved the movement of the pigs based on the customary "real world" veterinary practices discussed above. Notwithstanding, the court finds that whether Dr. Armbrecht breached his duty to LOL when he did not inform Dr. Hartzell that the Ehn facility was within the vicinity of the Hoag facility is a question for the trier of fact. Therefore, MSI's motion for summary judgment is denied.

### III. CONCLUSION

The court finds that, as a matter of law, Dr. Armbrecht owed an implied duty to LOL to use the degree of skill, care and learning ordinarily possessed, exercised and used by other veterinarians in similar circumstances with respect to the movement of the pigs from the Monahan facility to the Ehn facility. However, the court finds that Dr. Armbrecht has generated a genuine issue of material fact as to whether he breached this duty in light of the alleged customary "real world" veterinary practices with which he asserts he complied during the time that the LOL pigs were moved from the Monahan facility to the Ehn facility. Therefore, MSI's Motion for Summary Judgment is denied. Furthermore, as this court concluded previously, Dr. Armbrecht's Motion for Summary Judgment is also denied because it is based on a claim not pled by MSI.

**IT IS SO ORDERED.**